**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
Atlanta Division**

| | |
|---|---|
| RONALD D. CHAPMAN and ) <br> VICKIE L. CHAPMAN, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> UNITED STATES OF AMERICA, ) <br> ) <br> Defendant. ) | Civil Action No. _____ |

# COMPLAINT

Plaintiffs Ronald D. Chapman and Vickie L. Chapman, by counsel, state as follows for their Complaint against Defendant United States of America:

## JURISDICTION, VENUE, AND PARTIES

1. This action arises under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq*. This Court is vested with jurisdiction to adjudicate this dispute pursuant to 28 U.S.C. § 1346(b).

2. In compliance with 28 U.S.C. § 2675, Plaintiffs filed an administrative tort claim with the Department of Veterans Affairs, which is attached as **Exhibit A**. That claim was received by the Office of General Counsel on April 28, 2020.

3. The Department of Veterans Affairs denied this claim on March 16, 2021.

4. Accordingly, Plaintiffs' causes of action are ripe to be litigated in this Court pursuant to 28 U.S.C. § 2675(a).

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1402(b) because the causes of action at issue in this case arose at the Atlanta VA Medical Center ("Atlanta VAMC") at 1670 Clairmont Road, Decatur, Georgia 30033.

6. At all times relevant to this action, the United States owned and operated the Atlanta VAMC and its affiliated clinics.

7. At all times relevant to this action, the agents, servants, employees, and personnel of the United States were acting within the course and scope of their employment in providing and/or failing to provide medical care and treatment to Mr. Chapman.

8. Mr. Chapman is a veteran of the United States Armed Forces, and thus is entitled to medical care and treatment at the Atlanta VAMC and its affiliated clinics.

9. The care described as follows was provided to Mr. Chapman at the Atlanta VAMC unless otherwise stated.

10. Submitted with this Complaint as **Exhibit B** is the Affidavit of William Waschler, M.D., a Board-certified ophthalmologist. This affidavit includes the opinions of a well-qualified expert competent to testify on the matters at issue in this case and sets forth specifically one or more negligent acts and/or omissions claimed to exist and the factual basis for each such claim. This affidavit fulfills the pleading requirements of Georgia law as set forth in O.C.G.A. § 9-11-9.1, but that law is not applicable to the claims in this lawsuit which arise under federal law. This expert affidavit is submitted only out of an abundance of caution and to demonstrate a good faith and substantial factual basis for Plaintiffs' claims in this matter.

## ALLEGATIONS

11. Plaintiffs re-state and re-allege paragraphs 1 through 10 as if fully stated herein.

12. Mr. Chapman has suffered permanent vision loss because of negligence on the part of his healthcare providers at the Atlanta VAMC.

13. In January 2019, Mr. Chapman was started on amiodarone for a new diagnosis of atrial fibrillation.

14. Although this medication was prescribed for Mr. Chapman by a non-VA healthcare provider at The Heart Center of Northeast Georgia Medical Center,

his VA providers were aware of this medication and documented its use in Mr. Chapman's medical records.

15. Due to delays at the VA, Mr. Chapman filled his first amiodarone prescription outside the VA on February 3, 2019. Subsequent refills were provided to Mr. Chapman by the Atlanta VAMC pharmacy.

16. On February 20, 2019, Mr. Chapman was seen in the Atlanta VAMC Ophthalmology Clinic for a pre-operative appointment prior to planned cataract surgery.

17. At that time, he was seen by Lijy J. Kuttukaran, N.P. ("Ms. Kuttukaran"), who noted that Mr. Chapman was "on amiodarone" for atrial fibrillation. Ms. Kuttukaran documented that she discussed Mr. Chapman's treatment with Dr. Douglas M. Blackmon ("Dr. Blackmon"), a staff physician in the Ophthalmology Clinic.

18. Subsequently, Mr. Chapman had successful cataract surgery on his right eye at the Atlanta VAMC on February 25, 2019.

19. As previously planned, Mr. Chapman then underwent cataract surgery on his left eye at the Atlanta VAMC on April 10, 2019.

20. This surgery was performed by Dr. Blackmon and most of Mr. Chapman's subsequent visits to the Atlanta VAMC Ophthalmology Clinic were with Dr. Blackmon.

21. On April 18, 2019, at a post-operative visit with Dr. Blackmon, Mr. Chapman reported "a small shadow inferiorly in vision of left eye" which had begun that morning. Dr. Blackmon performed an examination and found no indication of retinal detachment or other issues. Mr. Chapman was counseled to report any worsening of his symptoms.

22. Mr. Chapman returned to see Dr. Blackmon on April 23, 2019, and the vision deficit had not resolved. On examination, Dr. Blackmon noted "disc edema on exam c/w visual symptoms, likely AION." Dr. Blackmon's differential diagnoses included "naAION [non-arteritic anterior ischemic optic neuropathy], aAION [arteritic anterior ischemic optic neuropathy], infectious, idiopathic, etc." Dr. Blackmon ordered a number of lab tests and prescribed prednisone to Mr. Chapman.

23. On the following day, April 24, 2019, Dr. Blackmon called Mr. Chapman to discuss the lab test results. Dr. Blackmon concluded that the lab results and pertinent symptoms were not indicative of "GCA" (giant cell arteritis) and instructed Mr. Chapman not to take the prednisone.

24. On May 1, 2019, Mr. Chapman saw Dr. Blackmon in the Ophthalmology Clinic who documented "stable inferior field vision loss." Mr. Chapman also told Dr. Blackmon that he had been experiencing intermittent headaches for a month. After reviewing the lab test results and examining Mr. Chapman, Dr. Blackmon concluded that the vision loss was likely "due to NAION" (non-arteritic anterior ischemic optic neuropathy). He ordered an MRI of the brain and orbits to rule out any pathology and "finish workup."

25. The MRI, performed on May 31, 2019, did not reveal any compressive lesions to explain Mr. Chapman's purported optic neuropathy, however.

26. Due to Mr. Chapman's vision loss, Dr. Blackmon referred him for a Low Vision Evaluation, which took place on September 9, 2019. Mr. Chapman reported during this evaluation that he had suffered a fall in his home which he attributed to the loss of his peripheral vision and described other difficulties caused by that vision loss.

27. Mr. Chapman continued to be followed in the Ophthalmology Clinic. On Friday, November 1, 2019, he called Dr. Blackmon and reported he had developed loss of peripheral vision in his <u>right</u> eye.

28. Mr. Chapman subsequently went to see Dr. Blackmon in the Ophthalmology Clinic on Monday, November 4, 2019. Dr. Blackmon's examination revealed new disc edema in Mr. Chapman's right eye, and he noted that this was "likely sequential naAION OD."

29. For the first time, Dr. Blackmon also made reference to the fact that Mr. Chapman was taking amiodarone, a medication known for its potential to cause ocular side effects, stating:

```
Of note, patient is on amiodarone approx 1 year.  Although not typical
presentation of amiodarone  toxicity, recommend patient discuss with outside
cardiologist to consider discontinuation at this time.  Pt will call
cardiologist today/tomorrow.
```

30. Later that day, after receiving Mr. Chapman's most recent lab test results, Dr. Blackmon made an addendum to his progress note in which he documented that he would recommend to Mr. Chapman that he "hold amiodarone if cleared by cardiologist":

```
11/04/2019 ADDENDUM                         STATUS: COMPLETED
ESR, CRP, and CBC all WNL.
Will call patient and inform now.
MRI ordered and to be scheduled.
Will arrange for f/u following MRI results
Recommend to hold amiodarone if cleared by cardiologist.
```

31. Based on his discussion with Dr. Blackmon and his own research, Mr. Chapman stopped taking the amiodarone on November 4, 2019, the first day the concern was raised by Dr. Blackmon.

7

32. Mr. Chapman made an appointment to see a new non-VA cardiologist several days later. He had been without a private cardiologist for some period of time when the VA changed its outside medical care from "Choice" to "Community Care" as Dr. Patel did not accept Community Care patients.

33. Mr. Chapman has continued to be followed in the Ophthalmology Clinic at the Atlanta VAMC. His records now contain a diagnosis of "presumed toxic amiodarone bilateral optic neuropathy."

34. Mr. Chapman's vision loss did not progress after he discontinued amiodarone. It has not improved, however, and is not expected to do so.

35. As a result of the loss of his vision, Mr. Chapman suffers frequent falls, including one down his home staircase which resulted in painful injuries. He has constant bruising on his shins from bumping into things he cannot see. Mr. Chapman must use extra caution in crowds, has difficulty with balance and stability, and cannot see in less than bright lighting. His eyes also fatigue easily.

36. Had Atlanta VAMC healthcare providers complied with the applicable standard of care in providing medical care and treatment to Mr. Chapman, it is more likely than not he would not have suffered permanent loss of vision in both eyes.

37. Because of Mr. Chapman's Atlanta VAMC medical providers' failure to timely discontinue the amiodarone and the delayed diagnosis and treatment of Mr. Chapman's vision loss from amiodarone toxicity, Mr. Chapman suffered progressive vision loss in both of his eyes that is permanent.

38. Mr. Chapman's loss of vision was a direct and proximate result of the negligent care provided by his healthcare providers at the Atlanta VAMC.

## Count I – Negligence

39. Plaintiffs re-state and re-allege paragraphs 1 through 38 as if fully stated herein.

40. As a provider of medical services to Mr. Chapman, the United States and its agents, servants, or employees at the Atlanta VAMC and its affiliated clinics owed Mr. Chapman a duty to provide him care consistent with the governing standard of medical care.

41. The agents, servants, or employees of the United States at the Atlanta VAMC and its affiliated clinics, while acting within the scope of their employment, violated the applicable standards of medical care in the following respects:

    a. Negligent failure to monitor Mr. Chapman for amiodarone toxicity;

9

    b.    Negligent delay in diagnosing optic neuropathy due to amiodarone toxicity, resulting in progression of the vision loss from the left eye to the right;

    c.    Negligent delay in discontinuing amiodarone, resulting in progression of vision loss; and

    d.    Other deviations from the standard of care which will be developed through further investigation, discovery, and expert review.

42. Indeed, Mr. Chapman's VA ophthalmologist breached the standard of care in failing to recognize Mr. Chapman's use of amiodarone and potential for complications prior to the cataract surgeries and in failing to timely identify amiodarone toxicity as the cause of his vision loss following the surgeries.

43. Prior to the first cataract surgery performed on February 25, 2019, the fact that Mr. Chapman was taking amiodarone was noted in the pre-operative history and physical performed in the VA ophthalmology clinic and documented in his chart.

44. Mr. Chapman first reported vision loss on April 18, 2019, eight days after the second cataract surgery. The differential diagnosis noted naAION (non-arteritic anterior ischemic optic neuropathy), aAION (arteritic anterior ischemic

optic neuropathy), and infectious or idiopathic potential causes for the vision loss, but neither were Mr. Chapman's medications reviewed nor was amiodarone considered in the differential diagnosis. This was a breach of the standard of care.

45. In addition, once the VA ophthalmologist ruled out an arteritic cause of the vision loss on April 24, 2019, amiodarone toxicity again should have been considered as the cause of Mr. Chapman's vision loss and the VA ophthalmologist's failure to do so was a breach of the standard of care.

46. And again, after the brain and orbit MRI came back showing no compressive lesions on May 31, 2019, it was also a breach of the standard of care to fail to recognize at that point that the likely cause of Mr. Chapman's vision loss was due to the amiodarone. According to the chart, Mr. Chapman's medications had still not been reviewed and amiodarone toxicity was not considered as a potential cause of the vision loss.

47. Instead, the delay in identifying the amiodarone toxicity was lengthy, nearly seven months following the onset of symptoms.

48. Had the standard of care been complied with and the amiodarone been discontinued as early as April or May 2019, Mr. Chapman's vision loss at the time likely would not have been permanent. Because of the delay in stopping the

amiodarone, Mr. Chapman's vision loss is now permanent due to the lengthy delay and failure to earlier recognize amiodarone toxicity as the cause.

49. As a direct and proximate result of the negligence of the agents, servants, and employees of Defendant, Mr. Chapman has suffered permanent vision loss and other damages.

50. Had Mr. Chapman been timely and appropriately counseled, diagnosed, and treated for his use of amiodarone and amiodarone toxicity, he would not have sustained the permanent vision loss he has suffered.

51. Accordingly, Mr. Chapman claims the following damages:

    a. Economic damages, including medical bills and expenses, mobility assistance, home modifications, lost income, and out-of-pocket expenses, both past and future;

    b. Non-economic damages, including pain and suffering, anxiety, stress, disfigurement, diminished quality of life, physical impairment, permanent disability, loss of enjoyment, and loss of consortium; and

    c. Compensation for any other damages sustained as a proximate result of Defendant's negligence.

52. For these damages, Mr. Chapman demands $4,000,000.00 in compensation.

## **Count II - Loss of Consortium**

53. Plaintiffs re-state and re-allege paragraphs 1 through 52 as if fully stated herein.

54. As a direct and proximate result of the negligence of the agents, servants, and employees of Defendant, Ms. Chapman, the spouse of Mr. Chapman, has suffered loss of consortium and other damages.

55. Had Mr. Chapman been timely and appropriately counseled, diagnosed, and treated for his use of amiodarone and amiodarone toxicity, he would not have sustained permanent vision loss and Ms. Chapman would not have suffered loss of consortium.

56. Accordingly, Ms. Chapman claims the following damages:

    a. Loss of consortium;

    b. Loss of affection;

    c. Loss of emotional support;

    d. Loss of society, companionship, and socialization;

    e. Loss of communication;

    f. Loss of help with chores;

      g.    Having to take on additional care duties for a disabled spouse;

      h.    Compensation for any other damages sustained as a proximate result of Defendant's negligence.

57. For these damages, Ms. Chapman demands $1,000,000.00 in compensation.

WHEREFORE, Plaintiffs request that the Court grant judgment in their favor against Defendant in the amount of Five Million Dollars ($5,000,000.00), together with any other costs they may be lawfully entitled to recover.

This 6th day of July, 2021.

                                                              Respectfully submitted,

                                                              RONALD D. CHAPMAN and
                                                               VICKIE L. CHAPMAN

By:   /s/ Dale C. Ray, Jr.
        Dale C. Ray, Jr.
        FAIN, MAJOR & BRENNAN, P.C.
        One Premier Plaza
        5605 Glenridge Drive, N.E.
        Suite 900
        Atlanta, GA 30342
        (404) 688-6633
        dray@fainmajor.com

        AND

                    Brewster S. Rawls (VA Bar No. 23604)
Glen H. Sturtevant, Jr. (VA Bar No. 73458)
RAWLS LAW GROUP, P.C.
211 Rocketts Way, Suite 100
Richmond, VA 23231
(804) 344-0038
brawls@rawlslawgroup.com
gsturtevant@rawlslawgroup.com
***Pro Hac Vice Pending***

*Counsel for Plaintiffs*

15