## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

RONALD CHAPMAN, AND
VICKEY CHAPMAN,

    PLAINTIFFS,

    *v.*

UNITED STATES OF AMERICA,
Defendant.

Civil Action No.

1:21-cv-02683-SDG

### THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

COMES NOW Defendant, the United States of America ("Defendant" or "United States") by and through counsel, the United States Attorney for the Northern District of Georgia, to move this Court for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure because, in the absence of expert testimony, Plaintiff Ronald and Vickey Chapman ("Plaintiffs") cannot establish a breach of a standard of care or causation. Even if the Court considered Plaintiffs' expert testimony, Plaintiffs lack sufficient evidence to support their case and fail to raise a genuine issue of material fact to avoid summary judgment. The specific basis for this Motion for Summary Judgment are more particularly set forth in this memorandum of law.

Respectfully submitted,

RYAN K. BUCHANAN
UNITED STATES ATTORNEY

/s/ *Melaine A. Williams*
MELAINE A. WILLIAMS
Assistant U.S. Attorney
Georgia Bar No. 057307
600 United States Courthouse
75 Ted Turner Dr., S.W.
Atlanta, Georgia  30303
Voice:      (404) 581-6000
Facsimile: (404) 581-4667

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

RONALD CHAPMAN, AND
VICKEY CHAPMAN,

       Plaintiffs,

       *v.*

UNITED STATES OF AMERICA,

       Defendant.

Civil Action No.

1:21-cv-02683-SDG

**THE UNITED STATES' BRIEF IN SUPPORT OF ITS MOTION FOR
<u>SUMMARY JUDGMENT</u>**

Plaintiffs Vickey and Ronald Chapman ("Chapman") collectively ("Plaintiffs")

filed this Federal Tort Claims Act, 28 U.S.C. §§ 2671, *et seq.* ("FTCA") action against

the United States of America ("Defendant"), seeking recovery for injuries Ronald

Chapman ("Chapman") allegedly incurred at the Atlanta Veterans Administration

Medical Center ("VA").   Plaintiffs allege that VA providers failed to recognize

Chapman's use of amiodarone heart medication and its potential for complications prior

to his cataract surgeries, and thereafter failed to timely identify amiodarone toxicity as

the cause of his lower peripheral vision loss. *See* Doc. 1 (Complaint, ¶ 42).[1]  Defendant

---

[1]   "Doc. ___" refers to the number assigned to the documents on the District
Court's docket sheet, and the pages in those documents.

asserts through its expert, Dr. Matthew Kay, a 30-year, fellowship-trained neuro-ophthalmologist, that Chapman did not suffer from amiodarone toxicity, but rather was coincidentally taking amiodarone when he suffered a nonarteritic anterior ischemic optic neuropathy ("NAION"). A NAION is a spontaneous, stroke-like, interruption of blood flow to the optic nerve and the most common cause of sudden onset vision loss from optic nerve disease in individuals over 50. Although no amount of vision loss is ever desired, Chapman fortunately did not permanently lose all his vision; he lost his lower peripheral vision, but still otherwise has 20/25 vision in both eyes.

Chapman seeks recovery for these injuries, but cannot avoid summary judgment for three reasons. First, Chapman provides no competent expert or testimony to establish a breach of the standard of care or causation. The absence of that expert testimony is fatal to Chapman's claims. Second, even with Chapman's expert testimony, he cannot overcome the presumption that the VA exercised due care at all times in treating Chapman. Third, with or without Chapman's expert testimony, he cannot establish that the VA's alleged breaches of the standard of care proximately caused his alleged injuries. A plaintiff cannot establish causation and survive summary judgment if the alleged harm could have occurred even if the defendant had met the standard of care. Neither a different treatment of Chapman's complications, nor stopping the amiodarone sooner could have prevented the spontaneous NAION. Because Chapman cannot recover on his medical malpractice claim, Vicky Chapman's

loss of consortium claim also fails.[2]  Defendant is entitled to summary judgment on all claims in this action.

## STATEMENT OF MATERIAL FACTS

The Statement of Undisputed Material Facts as to Which There Is No Genuine Issue To Be Tried, being filed contemporaneously with this Memorandum is incorporated by reference as if fully stated herein.

## I.   Legal Standard on Summary Judgment.

"Summary judgment is appropriate if the evidence before the court shows 'that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'  In making this determination, the court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995) (citations omitted). The movant bears the initial burden of showing the court, by reference to the record, that no genuine issues of material fact exist to be determined at trial. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The movant meets this burden by showing that there is an "absence of evidence to support the non-moving party's case." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593 (11th Cir. 1995).

---

[2]     *Anderson v. Dunbar Armored, Inc.*, 678 F.Supp.2d 1280, 1334 (N.D. Ga. 2009)(granting summary judgment on the spouse's derivative loss of consortium claim, after finding defendants entitled to summary judgment on husband's primary claim); *White v. Hubbard*,  203 Ga.App. 255, 257, 416 S.E.2d 568 (1992).  Plaintiff's counsel has also indicated that he intends to dismiss Mrs. Chapman as a plaintiff in this case.

## II.    Legal Framework Medical Malpractice FTCA Claims.

The FTCA waives the sovereign immunity of the United States and allows liability on behalf of the federal government to the same extent as a private party on a limited basis.  28 U.S.C. § 2674; *United States v. Orleans*, 425 U.S. 807, 813 (1976). Whether the federal government is liable under the FTCA is evaluated under the law of the state where the alleged negligent act or omission occurred.  28 U.S.C. § 1346(b)(1); *Stone*, 373 F.3d at 1130.  Accordingly, Georgia law controls the resolution of this action because all relevant acts or omissions occurred in Georgia.

Under Georgia law, "[a] person professing to practice surgery or the administering of medicine for compensation must bring to the exercise of his profession a reasonable degree of care and skill." O.C.G.A. § 51–1–27.  From this statute, Georgia courts have derived three elements to establish liability in a medical malpractice claim: "(1) the duty inherent in the doctor-patient relationship; (2) the breach of that duty by failing to exercise the requisite degree of skill and care; and (3) that this failure be the proximate cause of the injury sustained." *Zwiren v. Thompson*, 276 Ga. 498, 500 (2003); *Smith v. Am. Transitional Hosps., Inc.*, 330 F. Supp. 2d 1358, 1361 (S.D. Ga. 2004).

## ARGUMENT

**I.**    **Defendant Is Entitled To Summary Judgment On Count One Because Chapman Has Neither Presented Qualified Expert Testimony To Rebut The Presumption That Defendant Rendered Medical Services With Due Care, Nor Established A Breach of the Standard Of Care And Causation.**

To rebut the presumption that medical services were rendered with due care and skill, a plaintiff must present qualified expert witness testimony. *Shea v. Phillips*, 213 Ga. 269, 271, 98 S.E.2d 552, 554 (1957). Accordingly, Plaintiffs must provide qualified expert witness testimony on three essential elements: (1) the duty inherent in the provider-patient relationship; (2) the breach of that duty; and (3) proximate cause of the injury sustained. *Zwiren*, 276 Ga. at 499-502. Plaintiffs failed to meet this burden.

### A.    Plaintiffs failed to present qualified expert witness testimony to support their claims.

Rule 26 of the Federal Rules of Civil Procedure sets forth requirements for the disclosure of expert witnesses, including the requirement that a written report be provided. Fed. R. Civ. P. 26(a)(2). A plaintiff, thus, is required to disclose an expert report that contains "a complete statement of all opinions the witness will express and the basis and reasons for them," as well as all other information set forth in Federal Rule of Civil Procedure 26(a)(2)(B). Fed. R. Civ. P. 26(a)(2)(B).

Here in the summary judgment context, expert testimony is required to establish that the applicable standard of care required the VA providers who saw Chapman before his cataract surgery and Dr. Douglas Blackmon, the primary VA

ophthalmologist who treated Chapman after his cataract surgeries, to have diagnosed Chapman differently, and to have stopped the amiodarone sooner.  Further, Chapman is required to present expert testimony establishing that the VA and Dr. Blackmon's treatment proximately caused Chapman's lower peripheral vision loss.

In support of their allegations, Plaintiffs offer the testimony of one expert, William Waschler, M.D., a medical doctor who is board certified in ophthalmology. Defendant's Statement of Material Facts ("SMF") ¶ 54.  However, Dr. Waschler admittedly has not had a fellowship in neuro-ophthalmology which involves the study of optic nerve-related injuries or diseases.  SMF ¶ 55.  Dr. Waschler has only seen one patient with amiodarone toxicity, has never taught or authored any articles in the field of amiodarone toxicity, and never received any awards or recognition in this field. SMF ¶¶ 55-56.  As demonstrated in Defendant's pending "Motion to Exclude the Testimony of William Waschler, M.D.," neither Dr. Waschler, nor his opinions meet FRE Rule 702, Georgia law, and the standard articulated in *Daubert v. Merrell Dow Pharmaceutical*s, Inc., 509 U.S. 579 (1993) as qualified, reliable, and helpful to the trier of fact.  Doc. 46.  Dr. Waschler should be excluded as an expert in this case.  *See Duque v. U.S*, 216 F. App'x 830, 832 (11th Cir. 2007) (citing *Zwiren*, 276 Ga. at 500).

"The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1261

(11th Cir. 2004).   In the absence of expert testimony on the applicable standard of care and causation elements of his medical malpractice claim -- and in light of Dr. Blackmon's deposition and Dr. Kay's competent expert testimony -- the Court must grant summary judgment in favor of the United States.  *Dutton v. U.S.*, 621 Fed. App'x 962, 968 (11th Cir. 2015) (summary judgment was appropriate in FTCA medical malpractice action where plaintiff's only expert was properly excluded).

### B. Plaintiffs cannot overcome the presumption that the VA Providers acted in an ordinarily skillful manner.

Even if Plaintiffs had provided qualified expert medical testimony in support their claims – which they did not do – they would still be required to rebut the presumption that the VA providers exercised the care and skill ordinarily exercised by a doctor under like and similar circumstances.  *Smith*, 330 F. Supp. 2d at 1361.

Georgia law presumes that medical care was performed in an ordinarily skillful manner.  *Suggs v. United States*, 199 F. App'x 804, 807 (11th Cir. 2006) (quoting *Shea,* 213 Ga. at 271, 98 S.E.2d at 554).  To overcome this presumption, plaintiffs in medical malpractice cases must provide expert testimony establishing that the relevant medical professional breached the applicable standard of care.  *Smith*, 330 F. Supp. 2d at 1361; *Cole v. United States*, No. 1:18-cv-05901-SDG, 2021 WL 4267372, at *6 (N.D. Ga. Sep 20, 2021) ("the injured patient must present evidence from expert medical witnesses that the defendants did not exercise due care and skill in performing their services.") (citation omitted).  In addition, because "determination of whether the alleged

professional negligence caused an injury is beyond the ken of the average layperson, [ ] the plaintiff must use expert testimony to establish proximate cause." *Duque*, 216 F. App'x at 832 (citing *Zwiren*, 276 Ga. at 500); *Myers v. U.S.*, No. 1:19-CV-2486-CAP, 2022 WL 3589124, at *3 (N.D. Ga. June 13, 2022)(granting summary judgment after Plaintiff failed to offer any expert testimony to support her medical malpractice claims.).

Here, Chapman must establish two things by a preponderance of the evidence: (1) that VA providers breached the applicable standard of care, and (2) that this breach proximately caused Chapman's alleged injuries. *Duque*, 216 F. App'x at 832. As shown below, Chapman is unable to identify the applicable standard of care, let alone a breach thereof, or prove with or without Dr. Waschler's testimony that the VA's allegedly negligent treatment proximately caused Chapmans' injuries.

### 1. Chapman failed to identify the applicable standard of care.

"In a medical malpractice case, the standard of care is defined as that which physicians in general would follow under the same or similar circumstances." *Byrd v. Medical Center of Georgia, Inc.*, 258 Ga. App. 286, 288, 574 S.E.2d 326, 329 (2002) (citing O.C.G.A. § 51-1-27). To defeat Defendant's summary judgment motion, Chapman must establish what the applicable standard of care actually required of physicians generally, and then must set forth specific facts for reaching the conclusion that the VA's treatment did not meet the standard of care. *See Beauchamp v. Wallace*, 349 S.E.2d 791, 792, 180 Ga. App. 554, 555 (1986). Without these critical elements,

Plaintiffs fails to raise a genuine issue for trial. *Loving v. Nash*, 182 Ga. App. 253, 255, 355 S.E.2d 448, 450-51 (1987).

Here, Dr. Waschler offers nothing in his report that opines about the standard of care provided by the VA doctors. SMF ¶ 58. Dr. Waschler's report makes conclusory statements that the VA breached the standard of care, but does not refer to any professional standard, peer reviewed medical literature, practice, or guideline to support his view that the standard of care required different, more appropriate treatment for Chapman before and after his cataract surgeries. SMF¶ 59.

In his deposition, Dr. Waschler attempted to shore up his opinions, testifying that he researched some articles on the internet, but he could not remember which ones supported his conclusions or what they said in order for government counsel to cross examine him as to how they supported his causation and standard of care opinions. SMF ¶ 60. Notably, when asked whether he was here to render standard of care and causation opinions during his deposition, he stated "I was not aware of it [the request to render the opinions], so I guess I'm not able to answer that easily." SMF ¶ 61.

Dr. Waschler's conclusory testimony with no factual basis or explanation of what was done, versus what the standard of care required is insufficient to create an issue of fact or to avoid summary judgment. *See Beauchamp*, 349 S.E.2d at 792, 180 Ga. App. at 554 (finding plaintiff's expert affidavit insufficient to carry his burden, noting that "[r]ather than setting out what should have been done and comparing that to what was

done, the affidavit merely concluded that appellees' treatment did not meet the appropriate standard of care.") (citations omitted)). In the absence of an identifiable standard, Chapman cannot establish the standard of care or show that it was breached as demonstrated below.

### 2. Chapman failed to identify a breach of the standard of care.

In addition to failing to identify the standard, Chapman fails to show through expert testimony how VA providers *breached* the applicable standard of care. *See* (Doc. 1-2 at 6-8); *Skinner v. Coleman-Nincic Urology Clinic, P.A.*, 165 Ga. App. 280, 281 (1983). A review of the record shows that the medical services rendered by VA providers and Dr. Blackmon at all times complied with the applicable standard of care.

Viewing Dr. Waschler's written report and deposition testimony together, he offers his opinions (consolidated into three areas by Defendant) wherein he believes that the VA ophthalmologists breached the standard of care by:

(1) failing to recognize Mr. Chapman's use of Amiodarone and potential for complications prior to the cataract surgeries

(2) failing to review Mr. Chapman's medications and considering Amiodarone in the differential diagnosis;

(3) failing to timely identify Amiodarone toxicity as the cause of his vision loss following the surgeries, after he ruled out an arteritic cause of the vision loss on April 24, 2019, and after the brain/orbit MRI came back showing no compressive lesions on May 31, 2019.

Exhibit ("Ex") 8 (Affidavit Report and CV of Dr. Waschler ("Waschler Report")).

Dr. Waschler opines that the alleged breaches caused Chapman to suffer permanent vision loss.  *Id.* at 8.  Although no amount of vision loss is ever desired, Chapman lost his lower peripheral vision, but still otherwise has 20/25 vision.  SMF ¶ 44.  Regardless, nothing in Dr. Waschler's testimony reveals a breach of the applicable standard of care to overcome the presumption that the VA providers exercised due care in treating Chapman.

### a. *The undisputed evidence shows that VA providers rendered medical services with due care with regards to Chapman's use of amiodarone and its potential for complications prior to the cataract surgeries.*

First, Dr. Waschler loosely opines that VA ophthalmologists should have "recognized Mr. Chapman's use of amiodarone and potential for complications prior to the cataract surgery." Waschler Report at 7.  But on February 21, 2019, the non-VA cardiologist who prescribed Chapman's amiodarone sent a "cardiac clearance" letter, stating that Chapman is at low cardiac risk for cataract surgery.  SMF ¶ 11.  The record further shows that on February 20, 2019, Chapman had a cataract surgery pre-operative visit and was evaluated by a nurse practitioner for a history and a physical.  SMF ¶ 7.  She noted that he has Afib, is on amiodarone and apixaban, and does not have to stop apixaban for surgery.  *Id.*   The nurse practitioner discussed Chapman's history, medications, and physical with Dr. Douglas Blackmon, an Emory University Ophthalmology Resident and Assistant Chief of Ophthalmology at the Veteran Affairs Medical Center.  SMF ¶ 8.  Although Chapman was taking amiodarone, it was not

unusual for patients to take amiodarone during cataract surgery.  SMF ¶ 10. Therefore, it was not a medication that affected or stopped cataract surgery for the VA eye clinic who sees a lot of patients that take amiodarone. *Id*.

Dr. Waschler has not demonstrated that the VA violated any standard of care with regards to Chapman's treatment prior to the cataract surgery.  SMF ¶ 58.  Contrary to Dr. Waschler's opinions, the record is devoid of any evidence that the applicable standard of care required VA providers to take any additional specified action when faced with a patient who is taking amiodarone prior to cataract surgery.  His "bare conclusions" with no factual basis or explanation of what was done versus what the standard of care required is insufficient to create an issue of fact or to avoid summary judgment.  *See Bushey v. Atlanta Emergency Grp.*, 179 Ga. App. 827, 829-30, 348 S.E.2d 98, 101 (1986) ("meeting factual evidence with a bare conclusion does not create an issue of fact").

   ***b. Regardless of the spontaneous NAION, the undisputed evidence shows
       that Dr. Blackmon rendered medical services with due care with regards
       to his review of Chapman's medications, and he considered amiodarone
       in the differential diagnosis.***

Without support, Dr. Waschler opines that VA providers breached the standard of care by failing to review Chapman's medications, and considering amiodarone in the differential diagnosis Dr. Blackmon conducted in April 2019.  Waschler Report at 7.  But Dr. Blackmon did review the medications Chapman was taking, including amiodarone, when he performed the differential diagnosis (or diagnosis of exclusion)

-12-

that included, among other things, possible causes due to a toxic cause or "insult," and ruled it out.  SMF ¶ 24.  Dr. Blackmon's differential diagnosis also included NAION, aAION, infectious, idiopathic, traumatic, and genetic possibilities as other possible causes.  SMF ¶ 23.

Because Chapman's vision had deteriorated in the **left** eye (from 20/20 after the last cataract surgery on April 8, 2019, to 20/30 on April 23, 2019), and the disc edema had only presented in the **left** eye, Dr. Blackmon called Chapman on April 24, 2019, and explained that he did not think that the cause of his lower peripheral vision loss in his left eye was the result of some sort of "toxic insult" because that is not the way a toxic optic neuropathy typically presents.  SMF ¶ 25.  A toxic agent, if it's exposed to the body, it's exposed to the entire body at once, so typically a toxic optic neuropathy is going to be a bilateral process, *i.e.*, symptomatic in both eyes.  SMF ¶ 26.

The following week, during a May 1, 2029, visit, Dr. Blackmon discussed a diagnosis of "likely NAION" in the left eye with Chapman.  SMF ¶ 28. Dr. Blackmon was able to reach this conclusion because, previously on April 18, 2019, when Chapman reported seeing a small shadow in the visual field of the lower part of his left eye and reportedly had no floaters, Dr. Blackmon examined him that day, and confirmed no retinal tear, detachment or an artifact of the new lens from the cataract surgery, which typically goes away after a week or so.  SMF ¶¶ 16-18. Dr. Blackmon wanted to "watch him [Chapman] closely" and "be aware of his vision" so he

instructed Chapman to come back for a repeat exam if things worsened or change, since the symptom only developed that morning.  SMF ¶ 18.  Five days later, on April 23, 2019, Chapman returned for follow-up with Dr. Blackmon where he reported similar symptoms as April 18th in his left eye, but that his lower peripheral vision has gotten worse.  SMF ¶ 19.  Dr. Blackmon wanted to "thoroughly examine Chapman's eye and see what's going on," so he examined the front of the eye all the way back to see what was going on to assess his lens implant status, do the fundus exam, and look at his retina.  SMF ¶ 20.  Dr. Blackmon noted disc edema upon examination of the left eye, and "likely arteritic anterior ischemic optic neuropathy" ("AION"), which is a generic term of an "ischemic" event (when blood flow, and thus oxygen, is restricted or reduced in a part of the body) to the front part of the optic nerve that you see when you look in the eye.  SMF ¶ 21.  AION also includes giant cell and NAION.  *Id.*

Dr. Blackmon also noted that Chapman had a possible disc "at risk" in the **right** eye, which is something that goes along with a NAION, meaning that Chapman could unfortunately have a sequential NAION at some point in the future.  Blackmon Dep at 50:3-10.  Unfortunately there is no treatment for NAION.  It's like a stroke to the very tip of the optic nerve and like a stroke, there haven't been any studies to show what improves it.  Blackmon Dep at 53:11-15.

In his report, Dr. Waschler criticizes, but does not explain with specificity how or why Dr. Blackmon's differential diagnoses warranted a different consideration of

amiodarone when there was no evidence that the patient's visual loss represented a toxic optic neuropathy as the NAION had only occurred in Chapman's left eye by May 2019. Waschler Report at 7. Without doing his own differential and explaining how and/or why *he* would have excluded NAION, or why amiodarone toxicity could not be ruled out, Dr. Waschler fails to reveal a want of due care by Dr. Blackmon regarding the differential diagnosis. *Id; see also Shiver v. Ga & Florida Railnet, Inc.*, 287 Ga. App. 828, 830 (2007) (excluding opinion where physician "did not satisfy the requirements for a reliable differential diagnosis," did not consider "'all relevant potential causes of the symptoms,'" and "did not rule out all other possible causes"). The record is devoid of any evidence that Dr. Blackmon breached the standard of care or that it required Dr. Blackmon to take any additional specified action other than the ones taken.

    **c.** ***The undisputed evidence shows that Dr. Blackmon rendered medical services with due care with regards to Chapman's continued use of amiodarone after he ruled out an arteritic cause of the vision loss on April 24, 2019, and after the brain/orbit MRI came back showing no compressive lesions on May 31, 2019, regardless of the NAION.***

Third, Dr. Waschler also opined that VA providers should have "identif[ied] amiodarone toxicity as the cause of [Chapman's] vision loss following the surgeries," and two times thereafter -- after the VA ophthalmologist ruled out an arteritic (inflammation of the walls of arteries) cause of the vision loss on April 24, 2019, and after the brain and orbit MRI showed no compressive lesions on May 31, 2029. Waschler Report at 7-8. But the testimony of Defendant's expert, Dr. Kay, shows that

amiodarone toxicity was *not* the cause of his vision loss.  SMF ¶¶ 51-52.  And although Dr. Waschler opined that Defendant breached the standard of care by failing to timely identify amiodarone toxicity as the cause of his vision loss following the surgeries, he would not go as far to state that amiodarone toxicity caused Chapman's vision loss to a reasonable degree of medical certainty in his deposition.  SMF ¶ 65.  Instead, he only testified that Chapman had some characteristics of amiodarone toxicity and some that were NAION).  *Id.*  Thus, Dr. Waschler's deposition testimony undermined his written opinion that VA officials should have diagnosed amiodarone toxicity as the cause.[3]

Dr. Waschler's opinions are unsupported by anything but his experience and training as an ophthalmologist.  When asked what in his clinical experience qualified him to render an opinion about amiodarone toxicity, Dr. Waschler admitted that he only diagnosed one patient with amiodarone toxicity (about 4-5 years ago) in his 33 years of practice, that he saw one during a neuro-ophthalmology rotation in med school in 1984, and that amiodarone toxicity was covered (but not the topic of discussion) as part of a continuing education course he attended.  SMF ¶ 57.  He did not review Chapman's medical records or visual field studies – only a medical summary—and the first time he

---

[3] Furthermore, Dr. Waschler's opinion that Chapman's vision loss would not have been permanent if the amiodarone had been discontinued as early as April or May 2019 is unhelpful in this Circuit where it previously affirmed the exclusion of an expert's opinion that surgery should have occurred sooner, finding that it is "just simply common understanding and doesn't rise to the level where someone would bother reporting that because everyone knows that." *McDowell v. Brown*, 392 F.3d 1283, 1299-1301 (2004).

researched amiodarone toxicity was on the internet in May 2021 after being retained as an expert. SMF ¶ 63.  He does not have a fellowship in the area of neuro-ophthalmology like Dr. Kay, a fellowship-trained neuro-ophthalmologist with over 30 years' experience, who has extensive expertise treating, diagnosing, and managing patients in his full time neuro-ophthalmology practice with amiodarone toxicity, NAION, and numerous other optic nerve conditions.   SMF ¶¶ 45-46.   Dr. Waschler has no specialized training in the field of amiodarone toxicity, but admittedly considers himself to be an expert in comprehensive ophthalmology which involves taking care of a patient's cataract surgery and glaucoma care.  SMF ¶ 62.  Thus, Dr. Waschler's entire theory about a breach of the standard of care is based on one "questionable" treatment of a single patient,[4] an observation during a 1984 medical school rotation, and research on the internet.  *Id.*  As demonstrated below, whatever breaches he ascribed to in his Report for causing amiodarone toxicity, he abandoned when he testified that Chapman's condition was not definitively caused by amiodarone toxicity or NAION. *Id.* at 42:15-22.  His lack of expertise diagnosing patients with amiodarone toxicity is fatal to his ability to testify about the VA's alleged negligence in this case.

In contrast to Chapman, who presented no competent expert testimony, the United States presented the expert testimony of Dr. Kay, a highly sought after

---

[4] Defendant requested a sanitized, HIPPA-compliant copy of the medical record of the patient to confirm that Dr. Waschler actually treated a patient with amiodarone toxicity, however, Plaintiffs' counsel refused to produce any such medical record.

fellowship-trained neuro ophthalmologist, who has extensive expertise treating and diagnosing patients with amiodarone toxicity and NAION, received numerous awards from the American Academy of Ophthalmology, has presented numerous lectures, including ones sponsored by the Academy of Ophthalmology on amiodarone and NAION, and has been a member of several medical societies, including the American Academy of Ophthalmology where he was Past Chair, and Vice Chair of the Practicing Ophthalmologist Curriculum.  SMF ¶¶ 47-48.

Dr. Kay opined that the care rendered by Dr. Blackmon and the other VA providers at all times met the standard of care, and did not predispose Chapman to develop the sequential episode of AION with his right eye in November 2019.  SMF ¶ 51.  Dr. Kay found that Chapman "experienced two discrete episodes of acute visual loss separated by an interval of seven months, which was much more compatible with the diagnosis of bilateral sequential NAION in an individual who coincidently happened to be taking amiodarone."  SMF ¶ 51.c.  Dr. Kay further indicated that the "apoplectic [aka stroke] nature of the visual loss on each occasion is much more suggestive of a vascular event/AION (stroke), as opposed to a toxic optic neuropathy [where the medicine gets into an individual's bloodstream], which tends to be bilateral, simultaneous, an insidious in nature."  SMF ¶ 51.d.  Dr. Kay was able to reach this conclusion because he reviewed Chapman's numerous vision examinations over the 6 weeks prior to Chapman's acute visual loss in his initially involved left eye in May

2019, through the Chapman's last visual field with the VA in January 2020. SMF ¶ 51. Dr. Kay also reviewed Dr. Waschler's report and disagreed with his impressions that Chapman suffered from amiodarone toxicity. SMF ¶ 51.g. Dr. Kay held all of his opinions to a reasonable degree of medical certainty. *Id.*

Accordingly, Plaintiffs have not explained what treatment the standard of care required and/or how anyone breached that standard. Chapman has failed to offer sufficient evidence to rebut the presumption that the care rendered by VA providers complied with the standard of care. Summary judgment should be granted.

### C. Chapman failed to establish Dr. Blackmon's alleged breaches of the standard of care proximately caused his alleged injuries, and without expert witness testimony establishing proximate cause, the United States is entitled to summary judgment.

To establish proximate cause, Chapman is required to establish through expert testimony that VA providers and Dr. Blackmon's negligent treatment proximately caused his injuries. *See Duque*, 216 F. App'x at 832 (citing *Zwiren*, 276 Ga. at 500). "Under Georgia law, expert testimony is required to establish proximate causation in a medical malpractice action because the question of whether the alleged professional negligence caused the plaintiff's injury is generally one for specialized expert knowledge beyond the ken of the average layperson." *Zwiren,* 276 Ga. at 500; *Smith v. Luckett*, 271 S.E.2d 891, 893 (Ga. App. 1980) (requiring expert testimony to establish causation).

-19-

In addition, an expert opining on the issue of proximate causation must "state his opinion regarding proximate cause with a reasonable degree of medical certainty." *Zwiren,* 276 Ga. at 500 (internal citations and punctuation omitted).  Consequently, establishing proximate cause with a "reasonable degree of medical certainty" requires more than a "mere possibility" that the medical provider's actions caused the harm. *Id.*

This Court granted summary judgment to the United States in *Cole v. United States,* an FTCA medical malpractice case wherein the plaintiff alleged that VA physicians were negligent in failing to diagnose his infection earlier, which resulted in severe complications, prolonged hospitalization, and multiple surgeries.  *Cole*, 2021 WL 4267372, at *6.  The *Cole* court excluded plaintiff's single expert witness for failing to meet the standard set forth in *Daubert* and FRE 702.  *Id.*  Without expert testimony, the Court ruled that plaintiff could not establish that any alleged breach of the standard of care proximately caused the plaintiff's injuries, and granted summary judgment.  *Id.*

Likewise, here, without competent expert witness testimony, Chapman cannot meet his burden of proving that Dr. Blackmon's – or any other medical professional at the VA – allegedly negligent medical treatment proximately caused any of his injuries. To the extent Waschler's Report purports to offer standard of care and causation opinions on amiodarone toxic neuropathy, he certainly abandoned those opinions in his deposition.  SMF ¶ 65. When asked four separate times whether amiodarone toxicity or

another possible condition (NAION) caused Chapman's lower field vision loss, Dr.

Waschler equivocally testified as follows:

> But it did not, in my opinion, fall into classical non-arteritic AION or amiodarone toxicity. So you're in this gray zone, where you have symptoms, signs in both sides, and you need to consider amiodarone as a possibility of causing this optic nerve that amiodarone or amiodarone toxicity caused Plaintiff's injuries.

*See* SMF ¶ 65.

> Q:    Okay So what –what did –where did he fall?
> A:    In this gray zone of – had some characteristics of amiodarone toxicity and some that were non-arteritic AION.

*Id*.

> Q:    But the fact that they [AION] happened seven months apart, does that affect your opinion as to whether it was amiodarone toxicity or AION?
> A:    *Again, I don't think it's definitive one versus the other*, but I do think that the calculations that this was an acute episode, I'm not sure – that's the way I read the documents from the charting notes.

*Id*.

> Q:    Do you have an opinion on what caused Mr. Chapman's condition?
> A:    Yeah, I *think* that it was the amiodarone toxicity should have been discontinued as standard of care.
> Q:    As standard of care.  But do you have an opinion on what caused his condition?
> A:    Probably, it was the amiodarone toxicity.
> Q:    You said probably?
> A:    Mm-hmm.

*Id.*

The only opinion that he testified to a reasonable degree of medical certainty was

that there was the *possibility* of Chapman having either a NAION or amiodarone

toxicity.   SMF ¶ 66. It is insufficient for Plaintiffs to show that merely taking

amiodarone was a *possible* cause of Chapman's peripheral lower vision loss; they must show by a preponderance of the evidence that the amiodarone toxicity more likely than not caused the peripheral vision loss.[5] *Moore v. Singh*, 755 S.E.2d 319, 324, 326 Ga. App 805 (2014) ("plaintiff must introduce evidence that it is *more likely than not* that the conduct of the defendant was a cause in fact of the result.") (emphasis added). Accordingly, Plaintiffs bear the burden of presenting reliable expert witness evidence establishing the *probability* that amiodarone toxicity proximately caused Plaintiff's vision loss. Dr. Waschler's deposition testimony -- that Chapman's condition was in a gray zone with "some characteristics of Amiodarone toxicity," that it was not definitively Amiodarone toxicity, and ultimately testifying that it was "probably" caused by amiodarone toxicity – is insufficient to establish proximate cause. SMF ¶¶ 65-66. Proof of causation requires competent expert testimony rising above the level of "mere chance or speculation." *Anthony v. Chambless*, 231 Ga. App. 657, 659 (1998); *see James v. Flash Foods, Inc.,* 267 Ga.App. 210, 213 (2004) (holding bare possibility of causation is insufficient).

Waschler's opinions are as deficient as the ones espoused by the experts in *Cole* and *Davis* whose testimony was previously excluded by this Court. *See Cole,* 2021 WL 4267372, at *3 (excluding Plaintiff's expert testimony after finding his methodologies

---

[5] "A plaintiff cannot recover [] unless the plaintiff establishes by a preponderance of the evidence that the negligence 'either proximately caused or contributed to cause plaintiff harm.'" *Zwiren,* 276 Ga. at 500.

"undefined" and "unreliable"); *Davis v. U.S.*, No. 1:11-cv-01211-ODE, 2015 WL 11142426, at *22 (N.D. Ga. March 31, 2015) (rejecting plaintiff's expert's scientific testimony as unreliable).  Moreover, Dr. Waschler's causation opinion, like the *Cole* and *Davis* experts, "is a theory based on inadequate reliable scientific proof."  *Davis*, 2015 WL 11142426, at *22.  Here, the way amiodarone toxicity works does not support Dr. Waschler's theory, and significantly, the literature he provided through counsel after his deposition actually supports Dr. Kay's opinion.  *See* Ex. 10 ("Optic Neuropathy in Patients Using Amiodarone" by Purvin, *et al.*,).  The article divides the patients into three groups.  *Id.*  Chapman has similar clinical features and fits into Group 3 for patients who experienced sudden painless loss of lower vision 1 year after starting amiodarone therapy.  *Id. at 6.*  The authors conclude that Group 3's "clinical features are all most consistent with a diagnosis of NAION that by coincidence occurred while taking amiodarone. The relatively rapid subsequent resolution of disc edema constitutes additional supportive evidence."  *Id. at 700* (top right column).  Likewise, the *Davis* expert did not state the basis or cite articles to support her speculative theories.  *Davis*, 2015 WL 11142426, at *22.  Dr. Waschler's opinions are unsupported by science, and fail to support causation in this case.

Moreover, the medical records do not support Dr. Waschler's bald conclusions that Chapman's optic nerve disease was, "at the end, bilateral, was insidious in nature, was mild in visual acuity increase…, and was the clinician's [referring to Dr. Blackmon]

diagnosis, at a certain point, that this was amiodarone toxicity."  Exhibit ("Ex.") 9 (Waschler Dep at 38:20-39:2).  Indeed, it became bilateral "at the end" after the right eye experienced the NAION, but this second, spontaneous NAION occurred 7 months after the left eye – a time interval that Dr. Kay says would be "unheard of" in the setting of amiodarone toxicity.  SMF ¶ 53.  And the record shows that it was not insidious (gradually progressing with harmful effects).  Chapman's optic nerve edema resolved relatively quickly in each eye.  SMF ¶ 51.e.  Significantly, Dr. Waschler testified that he relied on Dr. Blackmon's diagnosis of amiodarone toxicity to opine that it was amiodarone toxicity, but he admitted during cross examination that Dr. Blackmon never made a definitive diagnosis of amiodarone toxicity in the medical record.  SMF ¶ 67.  Plaintiffs' speculation and conjecture -- without medical evidence or literature support -- does not suffice as expert testimony to a reasonable degree of medical certainty.  *Davis*, 2015 WL 11142426, at *22.

Finally, a plaintiff cannot establish causation and survive summary judgment if the alleged harm could have occurred even if the defendant had met the standard of care. *Miranda v. Fulton DeKalb Hosp. Auth*., 284 Ga. App. 203, 207, 644 S.E.2d 164 (2007) (affirming summary judgment where plaintiff admitted patient's suicide "could have been unpreventable" even if standard of care met); *see also King v. Zakaria*, 280 Ga. App. 570, 577(4)(b), 634 S.E.2d 444 (2006) (plaintiff's expert testified that it did not matter that defendant deviated from standard of care because patient's condition

was unsalvageable); *Berrell v. Hamilton*, 260 Ga. App. 892, 896, 581 S.E.2d 398 (2003) (plaintiff's expert "admitted that he did not know whether earlier treatment would have made any difference").

Here, Chapman undeniably had a NAION—at no fault of the VA. SMF ¶ 51.a-h. Critically, Dr. Waschler's equivocal deposition testimony does not opine that VA medical providers caused either the NAION or amiodarone toxicity to a reasonable degree of medical certainty.   *See* SMF ¶¶ 65-66.   Against these undisputed facts, Chapman cannot show how stopping amiodarone in April 2019 would have prevented Chapman's lower field vision loss.   Though Dr. Waschler opined that Chapman's "visual loss would likely not have been permanent had amiodarone been discontinued in the spring of 2019," Dr. Kay opined that he has seen some patients with amiodarone toxic optic neuropathy develop some improvement of vision, but it was certainly not common.   SMF ¶ 51.h.   Rather, because of the prolonged half-life of amiodarone, Dr. Kay has encountered many patients who have experienced progressive visual deterioration *despite* discontinuation of treatment.   *Id.* (emphasis added).   Regardless, Dr. Kay did not feel that Chapman suffered from amiodarone toxic optic neuropathy, and thus concluded that the failure to discontinue amiodarone after involvement of his initial episode of presumed NAION in April 2019 did not produce any adverse impact or consequences.   SMF ¶ 52.   With or without expert testimony, Chapman fails to establish a breach or causation, and the Court must grant summary judgment.

## CONCLUSION

Based on the foregoing, Defendant respectfully requests that this Court award summary judgment to the United States and dismiss this action with prejudice.

Respectfully submitted,

RYAN K. BUCHANAN
UNITED STATES ATTORNEY

/s/ *Melaine A. Williams*
MELAINE A. WILLIAMS
Assistant U.S. Attorney
Georgia Bar No. 057307
600 United States Courthouse
75 Ted Turner Drive, S.W.
Atlanta, Georgia  30303
Voice:      (404) 581-6000
Facsimile: (404) 581-4667

## CERTIFICATE OF COMPLIANCE

I certify that the documents to which this certificate is attached have been prepared with one of the font and point selections approved by the Court in LR 5.1B for documents prepared by computer.

_s/ Melaine A. Williams_
MELAINE A. WILLIAMS
Assistant U.S. Attorney

**CERTIFICATE OF SERVICE**

I certify that on March 31, 2023, I electronically filed the within and foregoing with the Clerk of Court using the CM/ECF system, which will automatically deliver electronic notice to the following counsel of record:

> Glen Sturtevant
> Brewster Rawls
> Dale C. Ray, Jr.

> *s/ Melaine A. Williams*
> MELAINE A. WILLIAMS
> Assistant U.S. Attorney

28